IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

ARLENE SCHUETT,

                Plaintiff,                         No. 3:10-CV-784-HZ

     v.

ELI LILLY & COMPANY, a Foreign              OPINION & ORDER
Business Corporation, and CAMILLE
MYERS, an individual,

                Defendant.


Kim E. Hoyt
Spencer C. Rockwell
GARRETT HEMANN ROBERTSON, P.C.
1011 Commercial Street, N.E.
P.O. Box 749
Salem, Oregon 97308-0749

      Attorneys for Plaintiff


/ / /


1 - OPINION & ORDER

Ellen E. Boshkoff
Johane J. Domersant
BAKER & DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana 46204

      Attorneys for Defendant

HERNANDEZ, District Judge:

      Plaintiff Arlette Schuett brings this employment discrimination case against her former

employer, Eli Lilly & Company, and her former supervisor Camille Myers.  Plaintiff brings

pregnancy discrimination claims under Title VII, 42 U.S.C. §§ 2000e - 2000e-17, and Oregon

Revised Statute § (O.R.S.) 659A.030, as well as claims under the Family Medical Leave Act, 29

U.S.C. §§ 2601-2654 (FMLA), and the Oregon Family Leave Act, O.R.S. 659A.150-659A.186

(OFLA).

      Defendants move for summary judgment on all claims.  I deny the motion in part and

grant the motion in part.

## BACKGROUND

      Plaintiff, who had previously worked for Lilly in 2000-01 before leaving to work for

another company, was rehired by Lilly in April 2006.  She worked in the Midwest, but relocated

to Oregon in September 2007 after her previous division was reorganized and her position

eliminated.  Pltf Affid. at ¶¶ 3-4; Pltf Depo. at pp. 31, 34-36, 38.  In Oregon, she was a hospital

account specialist covering Southern Oregon.  Pltf Affid. at ¶¶ 3-4; Pltf Depo. at 35-36, 38.

Plaintiff began reporting to Myers, who was based in Seattle, as of September 1, 2007.  Myers

Affid. at ¶ 2.

      Plaintiff worked in this position, and for Myers, until she was terminated in February

2 - OPINION & ORDER

2009.  At the time of her termination, plaintiff was pregnant.  Defendants assert that plaintiff was terminated because she falsified calls to customers.  Plaintiff asserts she was terminated because she was pregnant, because she complained to defendants' human resources department about allegedly discriminatory treatment of her by Myers, and because she was going to use family leave.  For the purposes of summary judgment, defendants concede that plaintiff told Myers of her pregnancy in October 2008.

Plaintiff's performance of her duties was largely unsupervised.  Myers Affid. at ¶ 5.  She usually worked in her territory by herself.  Id.  Periodically, Myers conducted "field visits" with plaintiff, during which she observed plaintiff in the selling environment and provided feedback and coaching on selling, performance, development, and compliance with Lilly policies and procedures.  Id.  Afterwards, Myers compiled field visit memos (also called coaching notes), memorializing her comments.  Id.

According to Myers, plaintiff's duties included calling on four "customers" each day.  Myers Depo. at pp. 46, 99-100; Myers Affid. at ¶ 3.  Myers identifies "customers" as hospital physicians and certain other health care professionals.  Myers Affid. at ¶ 3.  Myers states that after each sales call, plaintiff was expected to record certain details about the call in her "call notes" in "Premier Force," a computer call entry system, including the name of the customer, the date of the call, and the type of call.  Id.  Lilly used the call activity as one measure of whether the employee was meeting expectations by seeing the right customers with the right frequency.  Id.

Plaintiff knew that she was to record vacation and sick days on "out-of-territory" reports.  Pltf Depo. at pp. 44-45.  She did not recall being trained on the use of those reports, and thought

3 - OPINION & ORDER

that "later on," "somebody might have said something" about putting an explanatory note in the out-of-territory report when she was out of her territory and not making calls.  Id.

Although Myers did not cite plaintiff's work performance as a basis for her decision to terminate plaintiff, both plaintiff and defendants rely on evidence of her past performance as revealed in annual performance reviews and periodic field visit notes/coaching memos, in support of their respective arguments regarding her termination.  In her 2006 annual review, completed by her prior supervisor, plaintiff was rated as "successful" in six "leadership behavior" categories and "needs improvement" in one category.  Ex. 4 to Pltf Depo. at p. 1.

Myers coached plaintiff on her performance in a December 3, 2007 field visit.  Ex. 13 to Pltf Depo.; Pltf Depo. at p. 206-07.  Myers recorded plaintiff's strengths as "Planning and Organizing - Implements Plan" and "Planning and Organizing - Stays Focused."  Ex. 13 to Pltf Depo.  Areas noted for development were "Gather's [sic] information (needs more time in field)" and "Develops the plan."  Id.  In the section for general comments, Myers wrote "[s]ounds like you had a hectic 2 weeks of vacation.  Hope you get everyone well and settled into your new home.  I'm really happy to have you back and ready to see your customers and make things happen in Oregon!"  Id.  Plaintiff was rated "at average" in the "core competencies" of analysis and decision making, and planning and organizing, both of which fall under the category of "manage the account."  Id.

Plaintiff's 2007 final performance review shows that it was completed by Myers.  Ex. 5 to Pltf Depo.  Myers states, however, that the ratings primarily reflected input from plaintiff's former manager in Milwaukee, Wisconsin.  Myers Affid. at ¶ 9.  Myers signed off on it and agreed with it nonetheless.  Id.

4 - OPINION & ORDER

In the 2007 annual review, it is noted that it had been a year of change because plaintiff was on leave from February to June 2007, was "reallocated" in June to August 2007, and moved from Milwaukee to Salem, Oregon in October 2007.  Ex. 5 to Pltf Depo.  Plaintiff had a good year with "ReoPro," and throughout the changes, plaintiff had maintained a positive attitude and strong learning "agility" which had helped her embrace "the transition to the new LHG behaviors."  Id.  The review notes that plaintiff was very organized, completed things ahead of schedule, and had jumped into her new leadership role as "Compliance Champ" "by keeping the team informed of upcoming tests and deadlines."  Id.  However, Myers also noted that plaintiff did not meet expectations in her "Portfolio" sales or her "Xigris sales."  Id.  As a result, Myers "[saw] her performing at a low successful level" and indicated that plaintiff would not get a merit increase.  Id.[1]  Nonetheless, plaintiff was rated "successful" in six leadership behavior categories and "needs improvement" in the category described as "implement with quality, speed, and value: make decisions and execute work plans to achieve results."  Id.

The record contains notes completed by Myers following remote coaching or on-site coaching/field visits in February 2008, May 2008, July 2008, October 2008, and November 2008.  In all of these notes, Myers noted both plaintiff's strengths and areas for development.  Ex. 14 to Pltf Depo. (February 2008:  noting strengths of adjusting interactions to customers, managing customer expectations, and resolving issues, and noting areas for development of improving

_____

[1]  This comment appears in the narrative portion of the "performance summary" section of the review.  Ex. 5 to Pltf Depo.  Immediately below this section is a "check box" section entitled "merit increase eligibility" where there is one box for "eligible - based on performance, employee will be considered for a merit increase," and another box for "ineligible - based on performance, employee is not eligible for a merit increase."  Id.  The box for "eligible" is checked, contradicting the previous comment made in the narrative section.

product knowledge and developing "the plan" consistently); Ex. 15 to Pltf Depo. (May 2008:
noting areas of strength as adjusting interactions to customers, articulating the patient type for
Lilly products, and interpreting information, and noting areas for development of developing the
plan consistently and understanding customer needs); Ex. 16 to Pltf Depo. (July 2008: indicating
strengths as adjusting information to customers and interpreting information and noting areas for
development as developing the plan consistently and understanding customer needs); Ex. 17 to
Pltf Depo. (October 2008: indicating plaintiff's strengths as adjusting interactions to customers
and product knowledge, and noting areas for development as developing the plan consistently
and understanding customers needs); Ex. 18 to Pltf Depo. (November 11, 2008: indicating same
strengths and weaknesses as in October 2008); Ex. 19 to Pltf Depo. (November 17, 2008:
indicating same strengths and weaknesses as November 11, 2008 and October 2008).

      In February, May, and July 2008, plaintiff received marks of "at average" or better in
several "core competencies." Ex. 14 to Pltf Depo. (February 2008: plaintiff was "at average" in
three "manage the account" core competencies, was "at average" in the core competency of
"becoming a valued partner," and was "above average" in the core competency of "major account
selling/grow the business"); Ex. 15 to Pltf Depo. (May 2008: plaintiff was "at average" in five
core competencies, including in "major account selling"); Ex. 16 to Pltf Depo. (July 2008:
plaintiff was "at average" in five core competencies).

      However, in October and November 2008, she received "below average" ratings in some
areas. Ex. 17 to Pltf Depo. (October 2008: indicating "at average" in three core competencies
but "below average" in analysis and decision-making and planning and organizing); Ex. 18 to Pltf
Depo. (November 11, 2008: "below average" in planning and organizing and "not observed" in

four other core competencies); Ex. 19 (November 17, 2008: "below average" in analysis and

decision making and planning and organizing).

The notes also reflect some downward trend in plaintiff's sales figures over the course of

2008. E.g., Ex. 16 to Pltf Depo. (July 2008: showing plaintiff's "composite" sales rank went

from 6/142 for the quarter ending in December 2007, to 70/142 for the quarter ending in March

2008); Ex. 18 to Pltf Depo. (November 11, 2008: listing one action item of calling Myers to

discuss plans for "making quota"); Ex. 19 to Pltf Depo. (November 17, 2008: showing plaintiff's

composite sales rank went to 113/142 for quarter ending June 2008, but improving to 95/142 for

quarter ending September 2008).

Plaintiff alleges that during the May 2008 coaching field visit by Myers, plaintiff

overheard Myers's end of a conversation Myers had with other managers and the regional director

about sales calls. Pltf Depo. at pp. 59-60. According to plaintiff, Myers told plaintiff that calls

were becoming an issue and she (meaning Myers) was under pressure to get four calls in a day.

Id. Plaintiff states that Myers told her that Myers did not care "what you need to do, you need to

get your calls in." Id. The following day, Myers told plaintiff she was under pressure because

the region was behind in making calls and that "we had to get our four calls in a day. She didn't

care how we did it, we just had to get it in. She was in the red right now and she needed to get

out of it because she didn't want to be in trouble." Id. at p. 61.

Plaintiff ended the conversation because plaintiff received a phone call from a clinical

pharmacist. Id. After the call concluded, plaintiff alleges that Myers said "[y]ou're going to put

that call in, right, for today?" Id. at p. 62. Plaintiff alleges she responded "no," to which Myers

replied "yes, you are, I need four calls in a day." Id. Plaintiff alleges that later that day, Myers

asked plaintiff to contact everyone in the region to tell them how to enter calls and to make sure they all got their four calls in and that Myers did not care how.  Id.  Plaintiff states that she told Myers she was not comfortable doing that, but Myers said "I am your manager, I need to be out of the red zone, you're going to get four calls in a day."  Id.  Plaintiff allegedly responded "this is how people get fired," to which Myers allegedly responded "I'm your manager, and I'm not looking to fire anybody, I'm happy with the region, we need to get this done."  Id. at pp. 62-63.  In deposition, plaintiff was asked if Myers told plaintiff to falsify calls, to which plaintiff responded "[s]he told me to read between the lines."  Id. at p. 63.   In her affidavit, she states that Myers was aware of, and instructed her on, the way in which to record sales calls.  Pltf Affid. at ¶ 8.

Plaintiff states that she told Myers of her pregnancy in October 2008 at a national convention in Las Vegas, during which plaintiff was recognized as an exceptional performer. Pltf Depo. at pp. 185-86; Pltf Affid. at ¶¶ 6, 9.  This was before Myers's October 27-28, 2008 field visit with plaintiff.  Plaintiff contends that at no point before October 2008 was Myers critical of the way plaintiff recorded her sales calls.  Pltf Affid. at ¶ 9.  Plaintiff states she received no negative performance evaluations or feedback from Myers before October 2008.  Id. at ¶ 7.   After she reported her pregnancy to Myers, however, plaintiff states that Myers was hostile, negative, and critical of plaintiff's work performance.  Id. at ¶ 10.

On October 28, 2008, after Myers's October 27-28, 2008 field visit, plaintiff contacted Lilly's human resources department to complain that Myers was treating her differently because of her pregnancy.  Ex. 2 to Houze Depo.  Plaintiff received some suggestions from human resources about approaching Myers.  Id.  Plaintiff called human resources back the next day to

ensure that the conversation she had had the previous day was confidential.  Ex. 2 to Houze

Depo.  She was assured it was.  Id.  Plaintiff reported that she had spoken with Myers and "it

went well" and that "things are back on track."  Id.

Plaintiff called human resources again following Myers's November 11, 2008 remote

coaching session.  Ex. 3 to Houze Depo.  She repeated her concern that since telling Myers of her

pregnancy, Myers had questioned her performance.  Id.

On November 24, 2008, notes made by Lilly's human resources staff indicate that after

the most recent call from plaintiff, they reviewed documents sent to them by plaintiff, but saw no

indication that plaintiff's announcement of her pregnancy was related to the coaching given by

Myers.  Ex. 3 to Houze Depo.  Human resources staff noted that Myers had detailed her

observations in the field visit/coaching notes and provided coaching in response to her

observations.  Id.  Upon calling plaintiff to tell her of their conclusion, plaintiff was still

convinced that Myers was linking her pregnancy and performance.  Id.  Plaintiff was told that a

different human resources employee would review the documents.  Id.  That employee came back

with the same observations.  Id.  Plaintiff was told that the second human resources employee

also saw no "red flags."  Id.; see also Pltf Depo. at p. 202.

Plaintiff's 2008 annual review notes several accomplishments.  Ex. 6 to Pltf Depo.

(noting that she had a successful year with "Portfolio Sales," "made quota on ReoPro" and

"Xigris," and had a strong start with insulin pens; further noting her contribution to a newsletter,

assisting new hires, helping prepare for a "launch," and providing district leadership).  The

review also notes that her overall sales trended down, and that in July through October, she did

not effectively prioritize her time, leading to gaps in customer contacts.  Id.  Although in

9 - OPINION & ORDER

November she improved her routing to include her key customers, she needed to focus on consistency in routing in order to "improve her ability to turn her business back around in 2009." Id.  She was rated "successful" in four leadership behaviors," "outstanding" in one leadership behavior, and "needs improvement" in two.  Id.  She received no unsatisfactory ratings.  Id. Plaintiff contends that during the meeting regarding this review, Myers asked how she was feeling, and asked about her age and her due date.  Pltf Depo. at pp. 194-95.  Plaintiff contends that Myers brought up her pregnancy again in early January 2009 while they were in Seattle for a meeting.  Pltf Depo. at p. 195.

On January 13, 2009, Myers contacted plaintiff to schedule a field visit in February, providing plaintiff with several available dates.  Myers Affid. at ¶ 17.  None of them worked and Myers thought that plaintiff was evasive in her answers.  Id.; Myers Depo. at pp. 175, 178-79.  It was unusual for a representative to be unavailable for a field visit, and in light of other concerns she had about plaintiff's territory, Myers began to suspect there may be problems with plaintiff's reporting of her activities.  Myers Depo. at p. 175; Myers Affid. at ¶ 17.

Myers reviewed plaintiff's calendar, then began gathering data from various sources, including plaintiff's physician call activity and expense reports.  Myers Affid. at ¶ 17.  Myers discovered information that troubled her, particularly information regarding plaintiff's time out of the field.  Id.  As a result, on January 14, 2009, she contacted human resources representative Susan Burleigh for guidance.  Id.  Burleigh referred Myers to human resources representative Miles Houze.  Id. at ¶ 18; see also Houze Affid. at ¶ 5.  At Myer's request, Houze ordered plaintiff's gas card report which shows mileage every time the sales representative puts gas in the car.  Houze Affid. at ¶ 6; Myers Affid. at ¶ 20.  With Houze's assistance, Myers analyzed various

records related to plaintiff to determine any discrepancies.  Id. at ¶ 7.  Houze states this is standard practice in any case of suspected call falsification.  Id.

Myers reviewed plaintiff's call and expense data and on January 16, 2009, forwarded a copy of her preliminary analysis of plaintiff's calls to Burleigh and Houze.  Myers Affid. at ¶ 19; Ex. 3 to Myers Affid. (copy of her analysis).  Myers also briefly looked at call data for other sales representatives in her district but found no significant discrepancies in that data.  Myers Affid. at ¶ 21.

Myers prepared a summary of various discrepancies in plaintiff's call reporting.  Id. at ¶ 22; Ex. 4 to Myers Affid. (copy of the summary and spreadsheet).  The summary noted items such as duplicate calls, questionable calls, mileage discrepancies, expense report lunches with entry errors, days out of territory that were not approved, and call entries which did not match routing on plaintiff's calendar.  Ex. 4 to Myers Affid. at p. 1.

Houze also asked Myers to attempt to verify plaintiff's call activity with physician offices. Myers Affid. at ¶ 23.  Myers contacted several doctors' offices about their internal policies about meeting with sales representatives, and to determine whether they knew plaintiff, whether she visited these doctors, and whether they could provide actual dates the doctors were available for lunch.  Id.  She recorded the information on her spreadsheet.  Id.

Myers states that the information she received suggested that plaintiff was falsifying calls. Id.  For example, she states that she confirmed with a doctor's office that the doctors do not see sales representatives on Fridays, yet plaintiff entered calls to those doctors on Friday, August 22, 2008.  Id. at ¶ 24.  She confirmed with another doctor's office that only three doctors worked on October 7, 2008, but plaintiff entered six calls.  Id.  She confirmed with another doctor's office

that the doctors did not attend lunch on October 15, 2008, but plaintiff entered two calls. <u>Id.</u>

Plaintiff contends that Myers again inquired about plaintiff's pregnancy at the end of January 2009. Pltf Depo. at pp. 196-97. At this time, according to plaintiff, Myers was inquiring about plaintiff's due date. <u>Id.</u> Plaintiff states that Myers stated she had to find someone to fill plaintiff's position because plaintiff's maternity leave coincided with the launch of Prasugrel, which Myers indicated was a big part of her business. <u>Id.</u> at p. 198.

On January 22, 2009, Myers generated an absence notice detailing plaintiff's maternity leave. Pltf Depo. at p. 197; Myers Affid. at ¶ 15. Under Lilly policy, such absence notifications are generated by the employee's manager. Pltf Depo. at pp. 197-98. Plaintiff's FMLA leave was approved. Houze Affid. at ¶ 17; Ex. 3 to Houze Affid.

On February 2, 2009, Myers did another remote coaching of plaintiff. Ex. 20 to Pltf Depo. There are no noted strengths or areas for development. <u>Id.</u> Plaintiff was rated below average in three core competencies, and not observed in two others. <u>Id.</u> Myers's general comments were: "Arlette - This is not what good looks like for a remote coaching call. I expect you to get engaged on your account as this is the top insulin account YOU picked for 3 quarters in a row. If there is something you don't know how to do, just ask as I am here to help you grow your skills and be successful." <u>Id.</u>

In early February, Myers scheduled a meeting with plaintiff for February 11, 2009, to discuss the discrepancies in plaintiff's call notes and expense reports. Myers Affid. at ¶ 26. Houze states that it is standard practice to not tell the employee the purpose of a meeting when there is a falsification investigation. Houze Affid. at ¶ 11; Houze Depo. at p. 106; Pltf Depo. at p. 100 (plaintiff states she was told she needed to come to Bend for a meeting with Myers).

12 - OPINION & ORDER

Myers states in her affidavit that "a script to be used to ask Schuett questions about my findings was generated."  Myers Affid. at ¶ 25; Ex. 5 to Myers Affid.

As had been arranged, plaintiff met Myers in the lobby of a hotel, and then went to a conference room with Myers.  Pltf Depo. at p. 102.  Houze participated by phone.  Id.  During the meeting, Myers discussed plaintiff's time out of the field.  Pltf Depo. at pp. 117, 124, 128-20. Myers inquired about several unapproved out of territory days, including six snow days in December 2008, and three additional days with no calls.  Id.  As for the snow days, Schuett could recall only that she took "whatever the schools did." Id. at pp. 128-29.  Otherwise, plaintiff's answer to Myers's questions regarding her out of territory questions was, for the most part, "I don't know." Id. at p. 124.

Plaintiff testified in deposition that Myers asked her about duplicate calls to the same doctor on the same day, to which plaintiff responded "I don't know how that would happen."  Pltf Depo. at p. 124.  According to Myers, duplicate calls are highly unusual and only very rarely would a sales representative see a doctor twice in one day.  Myers Depo. at pp. 136-37.

Myers asked plaintiff how it was that she recorded a call to a doctor in November 2008, but, during the February 2, 2009 remote coaching session, told Myers that she had never met him.  Myers Affid. at ¶ 27.  Myers states that plaintiff had no explanation.  Id.  In plaintiff's deposition, plaintiff could not recall having told Myers that she had not met that doctor.  Pltf Depo. at p. 143.

Houze states that during the meeting, Myers asked plaintiff about several discrepancies related to sales calls, time out of the field, mileage, and expenses.  Houze Affid. at ¶ 12.  He states that in many instances, plaintiff was unable to offer explanations for the discrepancies.  Id.

13 - OPINION & ORDER

Myers and Houze state that during the meeting, plaintiff admitted to falsifying calls.

Myers Depo. at p. 176 (plaintiff admitted to call falsification that day); Houze Affid. at ¶ 13 ("As

the meeting progressed, Schuett admitted more than once that she had falsified calls.").  In her

affidavit, Myers also states that she specifically recalled plaintiff's admission of call falsification,

and her contemporaneously-recorded notes contain at least two times where Myers wrote

"falsified" next to particular instances she had previously noted on her script.  Myers Affid. at ¶

28; Ex. 8 to Myers's Affid. at pp. 18, 19.

In her deposition testimony, plaintiff was asked these questions and gave these answers:

Q.  In this meeting [in February 2009] did you admit that you had entered calls
that you hadn't actually made?

A.  I'm not sure.

* * *

Q.  Did you admit to Mr. Houze or Ms. Myers in the meeting in February that you
had falsified calls?

A.  I told them I did what I was told.

Q.  Did you admit to falsifying?

A.  I don't recall.

Pltf Depo. at pp. 144, 150.

At some point, Myers and Houze took a break from the meeting and contacted individuals

in Lilly's human resources and legal departments.  Myers Affid. at ¶ 29.  Myers and Houze then

decided to terminate plaintiff's employment for falsification of call records.  Id.; Myers Depo. at

p. 176.

Plaintiff testified in deposition that following the meeting, she spoke with Houze

14 - OPINION & ORDER

privately and told him that she had filed a complaint against Myers because of her pregnancy and she did not believe that anything she said could change their minds. Pltf Depo. at pp. 103, 105-06. According to plaintiff, Houze did not respond. Id. at p. 106. Plaintiff's laptop was taken and she was escorted home by the security guards.

Any additional facts are noted below.

STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. Celotex, 477 U.S. at 322-23.

The substantive law governing a claim determines whether a fact is material. Suever v. Connell, 579 F.3d 1047, 1056 (9th Cir. 2009). The court views inferences drawn from the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. Long v. City & County of Honolulu, 511 F.3d 901, 905 (9th Cir. 2007).

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

DISCUSSION

I.  FMLA/OFLA

Plaintiff alleges that during the course of her employment with Lilly, she exercised her rights under FMLA by requesting leave for the birth of her child.  Compl. at ¶ 36.  She contends that Lilly retaliated against her and terminated her employment upon learning of her intention to exercise rights under FMLA.  Id. at ¶ 38.  She further alleges that Lilly's purported reason for terminating her is pretextual.  Id. at ¶ 40.

She makes identical allegations in support of her OFLA claim.  Id. at ¶¶ 46, 47, 48. Several decisions in this Court make clear that OFLA is to be construed consistently with FMLA. E.g., Benz v. West Linn Paper Co., No. 3:10–cv–519–ST, 2011 WL 2935396, at *19 (D. Or. July 20, 2011) (noting that under O.R.S. 659A.186(2), OFLA is to "be construed to the extent possible in a manner that is consistent with any similar provisions of" the FMLA and thus, Oregon courts look to federal law when interpreting the OFLA); Davis v. Pacific Saw & Knife Co., No. CV 08-676-HU, 2009 WL 936471, at *4 (D. Or. Feb. 12, 2009) (analyzing FMLA and OFLA claims together), adopted by Judge King (D. Or. Apr. 06, 2009).

It is clear that the claim plaintiff asserts in her Complaint is viewed in the Ninth Circuit as a FMLA "interference" claim.  The FMLA statutory scheme is as follows:

/ / /

16 - OPINION & ORDER

(a) Interference with rights

    (1) Exercise of rights

It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

    (2) Discrimination

It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

(b) Interference with proceedings or inquiries

It shall be unlawful for any person to discharge or in any other manner discriminate against any individual because such individual--

    (1) has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to this subchapter;

    (2) has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under this subchapter; or

    (3) has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under this subchapter.

29 U.S.C. § 2615.

In Bachelder v. America West Airlines, Inc., 259 F.3d 1112 (9th Cir. 2001), the Ninth Circuit discussed the difference between the FMLA's "interference" provision and its "discrimination" and "retaliation" provisions.  Under 29 U.S.C. § 2615(a)(1), the interference provision, "the issue is one of interference with the exercise of FMLA rights, . . . , not retaliation or discrimination."  Id. at 1124.  Under the discrimination provision in 29 U.S.C. § 2615(a)(2), an employer may be liable for discriminating against any individual for "opposing any practice made unlawful by this subchapter[.]"  29 U.S.C. § 2615(a)(2).  The separate retaliation provision in

17 - OPINION & ORDER

section 2615(b) prohibits discrimination against any individual for instituting or participating in

FMLA proceedings or inquiries.  29 U.S.C. § 2615(b).

As the Bachelder court explained, "[b]y their plain meaning, the anti-retaliation or anti-

discrimination provisions do not cover visiting negative consequences on an employee simply

because he has used FMLA leave.  Such action, is instead, covered under § 2615(a)(1), the

provision governing '[i]nterference[.]'" Bachelder, 259 F.3d at 1124; see also Xin Liu v. Amway

Corp., 347 F.3d 1125, 1133 n.7 (9th Cir. 2003) (noting that some circuits have held that claims in

which the plaintiff alleged that he or she was subjected to an adverse employment action for

taking FMLA protected leave, are properly brought under section 2615(a)(2), but that in the

Ninth Circuit, section 2615(a)(1) properly applies to employees who simply take FMLA leave

and as a consequence are subjected to unlawful actions by the employer; further noting that in the

Ninth Circuit, section 2615(a)(2) applies only to employees who oppose employer practices made

unlawful by FMLA).

In several cases, this Court has noted that claims designated by plaintiffs as FMLA

"retaliation" or "discrimination" claims are, in the Ninth Circuit, properly analyzed as

"interference" claims under section 2615(a)(1).  E.g., Benz, 2011 WL 2935396, at *19 (although

plaintiff had styled his claim as one for FMLA "retaliation," both the FMLA and OFLA claims

were "more properly analyzed as claims for 'interference' with his rights because they rel[ied] on

allegations of chilling Benz's statutory right to take FMLA (and OFLA) leave."); Davis, 2009

WL 936471, at *4 (plaintiff referred to a "retaliation" claim in her Amended Complaint, but at

oral argument acknowledged that in the Ninth Circuit, it was properly viewed as an interference

claim).

18 - OPINION & ORDER

Defendants have understood plaintiff's FMLA claim as an "interference" FMLA claim.

They argue that under the appropriate analysis for interference claims, plaintiff cannot show that

Lilly's conduct was motivated by the exercise of her FMLA rights.  In response, plaintiff argues

that defendants have mischaracterized her FMLA claim because she contends not only that she

suffered adverse consequences as a result of requesting leave (an "interference" claim), but also

in retaliation for complaining to Lilly's human resources department about how Myers treated her

after she requested leave.  I will first address the claim plaintiff originally brought in her

Complaint, which I view as a FMLA "interference" claim.  I will then address the

discrimination/retaliation claim she argues for in her summary judgment response memorandum.

A.  Interference Claim

To succeed on this claim, plaintiff must show that (1) she exercised her rights under the

FMLA; (2) defendants subsequently engaged in conduct that tended to chill the exercise of her

FMLA rights; and (3) defendants' conduct was motivated by the exercise of his FMLA rights.

Bachelder, 259 F.3d at 1124–26; see also Xin Liu, 347 F.3d at 1135-36 (noting that under

Bachelder, when an employee alleges that his or her FMLA leave is impermissibly considered in

the decision to terminate him or her, the court applies the standard set forth by the Department of

Labor in 29 C.F.R. § 825.220(c), and thus, at trial, an employee may prevail on a claim that an

employer interfered with her rights by terminating her in violation of FMLA by showing, by

either direct or circumstantial evidence, or both, that her taking of FMLA-protected leave

constituted a negative factor in the decision to terminate her).

Defendants do not challenge that plaintiff exercised her family leave rights and that they

engaged in conduct that tended to chill the exercise of her rights.  They argue that Lilly never

denied plaintiff's request for FMLA leave and that after plaintiff told Myers in January 2009 of her due date and request for leave, Myers immediately generated an absence notification for plaintiff and Lilly later approved her FMLA leave. More importantly, defendants argue, the evidence shows that plaintiff was terminated for falsifying calls when she was unable to explain the discrepancies in her sales calls, time out of the field, mileage, and expenses, and when she admitted that she had falsified calls.

Plaintiff argues that a reasonable juror could conclude that the call falsification allegation is a pretext and that defendants were motivated, at least in part, to terminate plaintiff because of her request for leave. Although the evidence is not overwhelming, when I construe the inferences in plaintiff's favor, I agree with plaintiff.

Defendants concede that for the purposes of summary judgment they must accept plaintiff's testimony that she told Myers in October 2008, not January 2009, about her pregnancy. While defendants correctly represent that there is no evidence in the record that plaintiff formally requested FMLA/OFLA leave in October 2008, the only reasonable conclusion by any employer upon learning of an employee's pregnancy is that some leave will be taken at some point. That is, a leave request is implicit in the notice of her pregnancy. Thus, I do not find it relevant that there was no formal request for FMLA/OFLA leave in October 2008. Moreover, a formal request for leave was generated in January 2009, before her February 2009 termination.

When viewing all of the evidence in a light most favorable to plaintiff, it is possible to read the post-July 2008 coaching notes and the 2008 annual performance review as being much more negative than the prior notes and annual reviews. Although plaintiff's sales numbers were lagging in 2008, the evidence of the performance evaluation/coaching notes, coupled with

20 - OPINION & ORDER

plaintiff's testimony that after October 2008, Myers began treating her differently, creates an issue of fact on the causation element.   Additionally, while plaintiff repeatedly responded to deposition questions by stating she could "not recall," she does state that in May 2008, Myers instructed her to make four calls per day, and Myers did not care how this was accomplished. Although Myers and Houze state that plaintiff admitted in the February 2009 meeting that she falsified calls, plaintiff's testimony is that she told Myers and Houze that she was doing what she was told.

A reasonable juror could conclude that plaintiff exercised FMLA/OFLA rights when she told Myers in October 2008 that she was pregnant and that defendants immediately engaged in conduct which chilled the exercise of her rights by giving her negative reviews, by Myers's decision to closely examine plaintiff's call reporting and other records, and then by terminating her.  Plaintiff creates an issue of fact as to whether her announcement to Myers in October 2008 that she was pregnant, and the inherent request for leave that such an announcement carried, followed by a formal leave request initiated in January 2009, constituted a negative factor in the decision to terminate her.

Defendants contend that even if plaintiff's testimony that Myers's May 2008 instructions to her were reasonably understood as an instruction to falsify calls, there are still undisputed facts showing that plaintiff had several other problems with her records, including unexplained out of territory dates, mileage discrepancies, and calls on physicians she admitted she had never met. Defendants also note that some of the issues with plaintiff's call reporting pre-date the alleged conversation with Myers in May 2008 and thus, that conversation cannot "explain away" the evidence of call falsification dating back to January of that year.

21 - OPINION & ORDER

I agree with defendants that there is evidence to suggest that plaintiff did not maintain proper records and that she may have falsified aspects of her call reporting. Nonetheless, the standard in regard to the FMLA/OFLA claim is that her request for FMLA leave constituted a negative factor in subsequent decisions regarding her employment. It is important to note here that some of the evidence relied on by defendants is disputed. For example, while Myers states that plaintiff told her she had never met the doctor she allegedly previously called on, plaintiff's testimony was that she did not recall telling Myers she had never met the doctor. This may be an honest failure to recollect a conversation or a deliberately evasive answer. Either way, however, crediting one or the other is an assessment of plaintiff's credibility which is inappropriate on summary judgment. Giving plaintiff the benefit of the doubt, which I must do, the evidence creates an issue of fact regarding that particular conversation. Additionally, the tone of the coachings/field visit memos became more negative almost as soon as plaintiff allegedly told Myers she was pregnant, which was before Myers had evidence of problems with plaintiff's records. Accordingly, the evidence as a whole creates an issue of fact regarding defendants' motives. I cannot say that no reasonable juror would conclude that plaintiff's pregnancy and leave request were not factors in the actions taken against her. Thus, on the FMLA/OFLA interference claim, I deny defendants' motion.

B. Discrimination/Retaliation

In order to qualify as a FMLA retaliation claim in the Ninth Circuit, plaintiff has to show that she meets the criteria of section 2615(b)(1), (2), or (3). At the time of her discharge, she had not engaged in conduct outlined in subsections (b)(1) or (b)(3). I understand subsection (b)(2) to address giving information as part of an investigation related to a FMLA claim. Accordingly, in

my opinion, her allegations that she was terminated because she complained to human resources about Myers are more likely viewed as a FMLA "discrimination" claim than a "retaliation" claim. In the end, however, as explained below, the distinction in this case is immaterial.

Defendants argue that plaintiff should not be allowed to bring a "newly-minted retaliation claim" because it falls outside the scope of her Complaint. Defendants cite to Coleman v. Quaker Oats, Inc., 232 F.3d 1271, 1291-94 (9th Cir. 2000) for the proposition that a plaintiff cannot avoid summary judgment by asserting a theory not pleaded or made known to a defendant during discovery because allowing a plaintiff to rely on an unpled theory would prejudice the defendant. I need not decide whether plaintiff's attempt to bring a separate FMLA claim based on a new theory of liability is appropriate because the evidence in the record is insufficient to create an issue of fact on the claim.

The express language of section 2615(b) addressing retaliation requires plaintiff to show that the discriminatory treatment was because of the protected activity recited in section 2615(b)(1), (b)(2), or (b)(3). Although the discrimination provision in section 2615(a)(2) does not expressly contain the "because of" language, plaintiff's allegation here is that her adverse treatment was in response to her complaints to human resources and thus, her argument presupposes the same causation element even if the claim is considered a discrimination claim. Thus, regardless of whether this is a FMLA retaliation claim or a FMLA discrimination claim, plaintiff must show that she was terminated because of her complaint to human resources regarding Myers's treatment of her.

The undisputed evidence in the record is that neither Myers nor Houze, who made the decision to terminate plaintiff, knew that plaintiff had complained to human resources about

23 - OPINION & ORDER

Myers's conduct toward her.  Myers Depo. at pp. 164; Houze Depo. at pp. 113, 121.   At oral argument, plaintiff contended that Burleigh was one of the human resources representatives she spoke to in the fall of 2008 when she called to complain about Myers, and that Burleigh was then involved in the decision-making process which led to her termination.  She argued that this is sufficient to show causation.

I disagree.  The notes from the conversations plaintiff had with human resources in the fall of 2008 show that she had substantive discussions with Mascelia Elaine Miranda and Karen O'Donnell.  Ex. 2 & 3 to Houze Depo.  Additionally, O'Donnell and Miranda performed the reviews of the documents plaintiff sent.  Ex. 3 to Houze Depo.  The only mention of Burleigh is when plaintiff called to confirm that a conversation she had with Miranda the previous day would be confidential.  Ex. 2 to Houze Depo.  Burleigh took that call and told plaintiff her conversation was confidential.  Id.

Later, Myers, after becoming suspicious about plaintiff's record-keeping, contacted Burleigh for guidance.  Myers Affid. at ¶ 17.  Burleigh referred Myers to Houze.  Id. at ¶ 18.  Other than Myers subsequently sending her preliminary analysis of data regarding plaintiff's records to both Houze and Burleigh, Myers Affid. at ¶ 19, there is no other mention of Burleigh in the record, including no evidence that she participated in any decision to terminate plaintiff.

Thus, while the record allows for an inference that Myers may have treated plaintiff differently because of her request for leave, there is nothing in the record to allow a factfinder to conclude that Myers or Houze could have been motivated in their actions by plaintiff's complaints about Myers to human resources.  There is no evidence whatsoever that either of them had any knowledge of the complaints.  And, there is no evidence that Burleigh played a role

in the termination decision.  Without such evidence, any discrimination/retaliation claim under

FMLA/OFLA that plaintiff asserts based on negative treatment caused by her human resources

complaints, must be dismissed.  E.g., Noga v. Costco Wholesale Corp., 583 F. Supp. 2d 1245,

1263 (D. Or. 2008) (no evidence that supervisor who refused to rehire plaintiff had knowledge of

complaints and thus, summary judgment to employer on plaintiff's retaliation claims was

appropriate); Dameworth v. Linn-Benton Comm. Coll., No. CV-07-6162-CO, 2007 WL

2816216, at *6 (D. Or. Sept. 27, 2007) ("'[e]ssential to a causal link is evidence that the employer

was aware that the plaintiff had engaged in the protected activity'") (quoting Cohen v. Fred

Meyer, Inc., 686 F.2d 793, 796 (9th Cir. 1982)).

I grant summary judgment to defendants on any FMLA/OFLA discrimination/retaliation

claim.

II.  Title VII/O.R.S.659A.030 Pregnancy Discrimination Claims

A.  Legal Standards

Generally, a plaintiff may prevail on summary judgment by providing direct evidence of

discrimination or by relying on circumstantial or indirect evidence and satisfying the burden-

shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas

Department of Community Affairs v. Burdine, 450 U.S. 248 (1981).  Swierkiewica v. Sorema,

N.A., 534 U.S. 506, 511-12 (2002); see also Cornwell v. Electra Cent. Credit Un., 439 F.3d

1018, 1029-30 (9th Cir. 2006) (plaintiff may rely successfully on either circumstantial or direct

evidence to defeat a motion for summary judgment in a civil action under Title VII).

The burden-shifting framework requires the plaintiff to first establish a prima facie case

of unlawful discrimination followed by the defendant articulating a legitimate, nondiscriminatory

reason for its action. McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1122 n.16 (9th Cir. 2004).

If the defendant does so, the plaintiff must show that the articulated reason is a pretext for

discrimination. Id.; Aragon v. Republic Silver State Disposal, Inc., 292 F.3d 654, 658-59 (9th

Cir. 2002).

Several cases make clear that the analysis for the O.R.S. 659A claim is the same as the

Title VII claim. E.g., Logan v. West Coast Benson Hotel, 981 F. Supp. 1301, 1319 (D. Or. 1997)

(in analyzing Oregon discrimination claims under Chapter 659, Oregon courts have looked to

Title VII cases for guidance because Oregon statutes are "wholly integrated and related" to Title

VII); Reid v. Evergren Aviation Ground Logistics Enters., Inc., No. CV-07-1641-AC, 2009 WL

136019, at *7 (D. Or. Jan. 20, 2009) (standard for establishing a prima facie case of

discrimination under 659A.030 is identical to that used to establish a prima facie case of

discrimination under Title VII); see also Pool v. VanRheen, 297 F.3d 899, 910 (9th Cir. 2002)

("Or. Rev. Stat. § 659A.030 was modeled after Title VII of the Civil Rights Act, 42 U.S.C. §

2000e-3(a), which prohibits similar conduct."). Also, the burden-shifting framework of

McDonnell Douglas applies to Oregon Chapter 659 claims adjudicated in federal court,

regardless of whether the jurisdictional basis for the state claim is diversity or supplemental

jurisdiction. Dawson v. Entek Int'l, 630 F.3d 928, 934-35 (9th Cir. 2011).

Defendants argue that plaintiff cannot establish a prima facie case and that even if she

can, she cannot establish pretext. For the reasons explained below, I disagree.

B. Prima Facie Case

To establish a prima facie case of discrimination under Title VII using the McDonnell

Douglas test, plaintiff must show (1) she belongs to a protected class; (2) she was performing her

26 - OPINION & ORDER

position in a satisfactory manner; (3) she was subjected to an adverse employment action; and (4)

she was treated differently than similarly situated persons outside of her protected class. See

Aragon, 292 F.3d at 658 (noting elements of prima facie case in Title VII race discrimination

case); Cleese v. Hewlett-Packard Co., 911 F. Supp. 1312, 1317 (D. Or. 1995) (noting elements of

prima facie Title VII disparate treatment claim of pregnancy discrimination).

The amount of evidence required to make out a prima facie case is very little, and need

not even rise to the level of a preponderance of the evidence. Wallis v. J.R. Simplot Co., 26 F.3d

885, 888 (9th Cir. 1994).

Defendants concede that plaintiff is a member of a protected class, her termination was an

adverse action, and that she was arguably qualified for her position. Defendants argue that

plaintiff has no evidence that any similarly situated employee who was not in a protected class,

was treated differently than she was.

Defendants note that plaintiff acknowledges that a male sales representative was also

discharged for call falsification and thus, her prima facie case fails. The record shows that male

employee Jim Vu replaced plaintiff after her discharge. Myers Depo. at p. 162. He was

terminated in April 2010 for falsifying calls. Ex. 4 to Rockwell Affid. (employee record showing

April 29, 2010 termination date); Myers Depo. at p. 162; see also Pltf Depo. at pp. 97-98

(plaintiff heard that Vu was let go and Vu told her that Myers had looked at his calls and he was

wrongfully terminated). Defendants argue that with this evidence, plaintiff cannot establish a

prima facie case because she cannot show that similarly situated employees outside of her

protected class were treated differently.

Plaintiff responds that the Ninth Circuit has acknowledged that evidence such as this,

27 - OPINION & ORDER

which post-dates the termination in question, has little value.  In Chuang v. University of Calif.,
225 F.3d 115 (9th Cir. 2000), the court explained, in discussing the issue of pretext, that the
hiring of three Asian professors "long after the Chuangs filed their complaints with the EEOC
and their lawsuit in federal court" eliminated "any probative value the evidence might otherwise
have." Id. at 1129.  The court explained that "[g]iven the obvious incentive in such
circumstances for an employer to take corrective action in an attempt to shield itself from
liability, it is clear that nondiscriminatory employer actions occurring subsequent to the filing of
a discrimination complaint will rarely even be relevant as circumstantial evidence in favor of the
employer." Id. (internal quotation omitted; further noting that an earlier Ninth Circuit case had
found the irrelevance of post-complaint promotions "even more apparent in disparate treatment
cases" which address "whether discrimination occurred prior to the commencement of a Title VII
action.").

     Defendants attempt to distinguish Chuang on the basis that there, the hires had occurred
more than eight years after the events in question, providing the basis for the court to rule that the
subsequent hiring practices were immaterial.  Defendants note that Vu's discharge took place
much closer in time to plaintiff's discharge than the post-complaint hires in Chuang.  But, it is
undisputed that at the time Vu was discharged, plaintiff had already filed an administrative
complaint alleging discrimination against defendants.  Although the Oregon Bureau of Labor and
Industries (BOLI) had dismissed that administrative complaint by the time Vu was fired because
it did not find sufficient evidence to continue its investigation, plaintiff still had the right to sue.
And, nothing in the discussion in Chuang suggests that the holding there hinged on the length of
time being eight years from the termination; rather, the focus was on the fact that the defendants'

28 - OPINION & ORDER

hiring actions occurred after the filing of an administrative complaint and a lawsuit.  Thus, I

agree with plaintiff that the evidence regarding Vu's firing is not probative of defendants'

termination practices.

However, it remains that plaintiff presents no evidence at all of a similarly situated

employee outside of her protected class who was treated differently.  Thus, plaintiff fails to

establish a prima facie case under the four-part McDonnell Douglas test.

In the Ninth Circuit, plaintiff is not required to use the McDonnell Douglas test to

establish a prima facie case.  Lowe v. City of Monrovia, 775 F.2d 998, 1006 (9th Cir. 1985) ("a

[Title VII] plaintiff can establish a prima facie case of disparate treatment without satisfying the

McDonnell Douglas test"), modified 784 F.2d 1407 (9th Cir. 1986).

The Lowe court explained that

a plaintiff may establish a prima facie case of disparate treatment by satisfying the
McDonnell Douglas four-part test, thereby creating a rebuttable presumption of
discriminatory treatment, or by presenting actual evidence, direct or
circumstantial, of the employer's discriminatory motive. When a plaintiff does not
rely exclusively on the presumption but seeks to establish a prima facie case
through the submission of actual evidence, very little such evidence is necessary
to raise a genuine issue of fact regarding an employer's motive; any indication of
discriminatory motive-including evidence as diverse as "the [defendant's]
reaction, if any, to [plaintiff's] legitimate civil rights activities; and treatment of
[plaintiff] during his prior term of employment; [defendant's] general policy and
practice with respect to minority employment," . . . -may suffice to raise a
question that can only be resolved by a factfinder. Once a prima facie case is
established either by the introduction of actual evidence or reliance on the
McDonnell Douglas presumption, summary judgment for the defendant will
ordinarily not be appropriate on any ground relating to the merits because the crux
of a Title VII dispute is the "elusive factual question of intentional
discrimination," . . . . Moreover, when a plaintiff has established a prima facie
inference of disparate treatment through direct or circumstantial evidence of
discriminatory intent, he will necessarily have raised a genuine issue of material
fact with respect to the legitimacy or bona fides of the employer's articulated
reason for its employment decision.

Id. at 1009 (citations omitted).

Plaintiff establishes a prima facie case through circumstantial evidence as discussed above in connection with her FMLA claim.  The circumstantial evidence is capable of suggesting that Myers's treatment of plaintiff, meaning the more negative performance coachings commencing in October 2008, the negative comments in the 2008 annual review, Myers's decision to dig into plaintiff's call records, and ultimately terminating her, was motivated by plaintiff's pregnancy because, primarily, the timing of these events coincides with plaintiff's informing Myers in October 2008 that she was pregnant.  Given that very little evidence is required for plaintiff to establish her prima facie case, she meets her prima facie burden.

C.  Legitimate, Nondiscriminatory Reason

If the plaintiff is able to make out a prima facie case, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment action. McDonnell Douglas, 411 U.S. at 802. As the Supreme Court explained, "the McDonnell Douglas presumption places upon the defendant the burden of producing an explanation to rebut the prima facie case- i.e., the burden of 'producing evidence 'that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993) (quoting Burdine, 450 U.S. at 254). This burden is one of production, not persuasion.  Id.

Defendants have produced evidence of a legitimate, nondiscriminatory basis for their actions by showing that plaintiff's sales numbers were declining through 2008, and she had discrepancies in her calls, mileage, out of field reports.

/ / /

30 - OPINION & ORDER

D.  Pretext

Plaintiff can establish pretext in two ways:  "(1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer."  Chuang, 225 F.3d at 1127.  Plaintiff does not need to prove both at summary judgment.  To survive summary judgment, plaintiff is not required to provide direct evidence of discriminatory intent as long as a reasonable factfinder could conclude, based on plaintiff's prima facie case and the factfinder's disbelief of defendant's reasons for discharge, that discrimination was the real reason for defendant's actions.  Nidds v. Schindler Elevator Corp., 113 F.3d 912, 918 n.2 (9th Cir. 1996).

Additionally, plaintiff does not have to introduce additional, independent evidence of discrimination at the pretext stage.  Chuang, 225 F.3d at 1127.  Rather, "a disparate treatment plaintiff can survive summary judgment without producing any evidence of discrimination beyond that constituting his prima facie case, if that evidence raises a genuine issue of material fact regarding the truth of the employer's proffered reasons."  Id.

Circumstantial evidence "can take two forms."  Coghlan v. American Seafoods Co. LLC, 413 F.3d 1090, 1095 (9th Cir. 2005).  The plaintiff can make an affirmative case that the employer is biased by, for example, relying on statistical evidence.  Id.  Or, "the plaintiff can make his case negatively, by showing the employer's proffered explanation for the adverse action is 'unworthy of credence.'"  Id. (quoting Burdine, 450 U.S. at 256).  As the Supreme Court explained in Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000), "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial

evidence that is probative of intentional discrimination, and it may be quite persuasive."
Moreover, "a plaintiff's prima facie case, combined with sufficient evidence to find that the
employer's asserted justification is false, may permit the trier of fact to conclude that the
employer unlawfully discriminated." Id. at 148.

Where evidence of pretext is circumstantial, rather than direct, the plaintiff must produce
"specific" and "substantial" facts to create a triable issue of pretext. Godwin v. Hunt Wesson,
Inc., 150 F.3d 1217, 1222 (9th Cir. 1998); but see Cornwell, 439 F.3d at 1029–31 (questioning
the continued viability of Godwin after Desert Palace, Inc. v. Costa, 539 U.S. 90, 100 (2003)).
That standard, however, "is tempered by our observation that, in the context of Title VII claims,
the burden on plaintiffs to raise a triable issue of fact as to pretext is hardly an onerous one."
Noyes v. Kelly Servs., 488 F.3d 1163, 1170 (9th Cir. 2007) (internal quotation omitted).

When the evidence is construed in a light most favorable to plaintiff, it is capable of
suggesting to a reasonable juror that defendants' asserted justification of call falsification is
pretextual and that the true motive behind defendants' actions was that plaintiff was pregnant and
that her leave was untimely coinciding with a new product launch.   Defendants contend they
fired plaintiff because of call falsification.  Plaintiff points to the alleged conversation in May
2008 with Myers when Myers told her to make four calls per day and Myers did not care how
this was done.  Plaintiff describes Myers telling her to record a call that was not a face to face
visit.  A reasonable juror could conclude that plaintiff appropriately understood Myers to be
saying that something less than face to face interactions with doctors could count as a call and
that is what plaintiff proceeded to do.  Defendants note that she was terminated for other
discrepancies in her call records and her mileage records, but the deposition testimony is that she

32 - OPINION & ORDER

was terminated for call falsification.  Plaintiff's testimony about the May 2008 conversation with

Myers about the call quota is specific evidence that could undermine the validity of the reason

defendants proffer as supporting plaintiff's termination.

Additionally, plaintiff's performance was certainly adequate before October 2008, at least

as indicated by her annual reviews and her coachings.  While both parties exaggerate to a certain

extent with plaintiff stating that her reviews showed her to be an exemplary and outstanding

employee and defendants suggesting that that her reviews showed there were problems all along,

the records speak for themselves and indicate that before October 2008, she was average to above

average with the occasional comment or rating suggesting areas of improvement, and after

October 2008, her reviews became much more negative.  The call falsification and record-

keeping justification for the termination does not explain the negative reviews she received

shortly after she allegedly disclosed her pregnancy because the that information was not known

to defendants until mid to late January 2009.

Defendants argue that plaintiff cannot show pretext because she admitted that she

falsified calls.  The deposition testimony on this is equivocal.  In her deposition, plaintiff said she

was not sure if she admitted falsifying calls during the February 11, 2009 meeting, and that she

did not recall doing so.  Pltf Depo. at pp. 144, 150.  She also said that she told Myers and Houze

that she did what she was told.  Thus, on this record, plaintiff does not concede that she made

that admission during the February 2009 meeting.

Defendants also point to the BOLI "Complaint Dismissal Memo" in which the BOLI

investigator stated that plaintiff "was terminated after the Respondent reviewed her calls and

concluded the Complainant had falsified calls she had made to buyers.  The Complainant

33 - OPINION & ORDER

admitted to the Respondent that she had falsified calls to buyers.  She admitted this conduct

when she was interviewed by the [Civil Rights Division of BOLI]."  Ex. 5 to Domersant Affid.

Defendants argue that the BOLI records are admissible as business records under Federal

Rule of Evidence 803(8).  Rule 803(8) allows the following documents into evidence as an

exception to the hearsay rule:  records, reports, statements, or data compilations of public offices

or agencies setting forth the activities of the office or agency, matters observed pursuant to duty

imposed by law as to which matters there was a duty to report, or (in civil actions), factual

findings resulting from an investigation made pursuant to authority granted by law, unless the

sources of information or other circumstances indicate a lack of trustworthiness.  Fed. R. Evid.

803(8).

While Rule 803(8) allows for admission of the agency's factual findings, it does not allow

the admission of hearsay contained within such factual findings.  Defendants do not make a

separate argument as to why the statement plaintiff allegedly made to the BOLI investigator (the

hearsay within the hearsay) is admissible.  Moreover, the rule notes that if there are

circumstances indicating a lack of trustworthiness, the record is not admissible.  Here, the

investigator's interview notes are appended to the dismissal memo.  The interview notes state that

"I [meaning the investigator] advised Complainant that Respondent says she was terminated

because she admitted that she had falsified call and expense records.  Complainant said that she

did that at the direction of Myers."  Id.  The investigator's notes do not support the investigator's

statement that plaintiff admitted to the investigator that she falsified records. Rather, her

statement to the investigator is consistent with her testimony that she did what she was told.

Finally, in the end, even if the double hearsay contained in the BOLI exhibit were admissible, the

34 - OPINION & ORDER

evidence, including plaintiff's description of her May 2008 meeting with Myers and her testimony that she acted only in accordance with Myers's instructions, must still be taken as true, and as a result, the evidence creates an issue of fact regarding the facts and circumstances under which plaintiff allegedly conceded that she falsified records.

Defendants' arguments suggest that in their view of the evidence, plaintiff is simply not believable. While this may be a prevailing argument at trial, it cannot be a basis for summary judgment. Because, when examining the evidence in a light most favorable to plaintiff, reasonable jurors could conclude that defendants were motivated by her pregnancy, summary judgment is inappropriate.

CONCLUSION

Defendants' motion for summary judgment [32] is granted as to a FMLA/OFLA retaliation/discrimination claim, but is otherwise denied.

IT IS SO ORDERED.

Dated this __21st__ day of __November__, 2011

/s/ Marco A. Hernandez
Marco A. Hernandez
United States District Judge

35 - OPINION & ORDER